IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 12-01076 (ESL) |
| NATIONAL PROMOTERS AND SERVICES INC. | CHAPTER 11 |
| Debtor | |
| NATIONAL PROMOTERS AND SERVICES, INC. | ADV. PROC. NO. 13-00051 (ESL) |
| Plaintiff | |
| vs. | |
| MULTINATIONAL LIFE INSURANCE COMPANY | |
| Defendant | |

<u>OPINION AND ORDER</u>

The issues before the court are whether the contract between National Promoters and Services, Inc. (hereinafter referred to as "NAPRO" or "Plaintiff") and Multinational Life Insurance Company (hereinafter referred to as "Multinational" or "Defendant") was validly terminated and whether Multinational owes NAPRO the amount of $115,000.00 corresponding to the December 2011 monthly fee.

NAPRO contends that: (i) Multinational breached its obligations under the Service Agreement when it failed to provide the December payment to the Debtor; (ii) "[i]t is undisputed that the terms of the Service Agreement provide for the payment of a fixed monthly amount of $115,000.00. Payment of this amount was not conditioned nor limited in any way in the Service Agreement. The evidence showed that the amounts due under the Service Agreement were paid by National Life Insurance Company (hereinafter referred to as "NALIC"), up to the time in which management of NALIC, now Multinational, changed. On December 2011 the contract was terminated unilaterally by Multinational; (iii) "[i]n this case the terms of the contract are clear,

therefore there is no need to go to the intent of the parties when establishing the obligations under Article 5 of the Service Agreement which leads to conclude that the Debtor is entitled to receive the December 2011 payment of $115,000.00, since the same was not conditioned and the contract was not validly terminated prior to the termination date of December 31, 2011;" (iv) "[i]f the Court agrees with Mr. Iguina, who testified he did not have the authority to terminate the contract, that the contract was in fact terminated by November 30, 2011, then it should also conclude that such termination was caused by Multinational unilaterally and not agreed by NAPRO who had the mechanisms to perform, even after Mr. Iguina took away NAPRO's key employees;" (v) "[t]he Service Agreement did not provide any cause for the unilateral termination of the agreement. Therefore, Multinational did not have a legal basis to unilaterally terminate the agreement;" (vi) "Multinational alleged a debt owed by NAPRO in the amount of $58,361.83 from a payment of $264,309.72 made by Evertec on February 10, 2010 due to a reimbursement from Evertec to National Group." No evidence was admitted to sustain the defense of compensation; (vii) Multinational also alleges that it is owed $75,000.00 from a loan made by NALIC to NAPRO. The record is devoid of a single piece of evidence and thus the defense is waived; and (viii) the amended 2009 financial statements reflect that there are no intercompany receivables for NALIC and the amended 2010 financial statements reflect intercompany receivables for NALIC in the amount of $9,643 from parent, various subsidiaries and various affiliates (Docket No. 217, pgs. 16-19)

Multinational argues that: (i) the parties mutually agreed to terminate the contract as a result of the meeting of Attorney Iguina- Oharriz and Mr. Rafael Rios Miranda; (ii) NAPRO did not have the personnel nor was rendering services for the month of December 2011 for almost all items covered by the Service Agreement, such as Finance, Accounting, Products and Public Relations, Computer Related Matters and Reinsurance respectively. NAPRO was not providing the services it was obliged to perform under terms of the contract; (iii) the Service Agreement was not previously approved by the Officer of the Insurance Commissioner (OCS) under Article 29.230 of the Insurance Code of Puerto Rico; (iv) the Service Agreement was not approved by a

valid constituted Board of Directors of NALIC because at the time there was none and there was no corporate resolution from NALIC authorizing it to enter into the Agreement with NAPRO. This is in violation of NALIC's By-Laws; namely; Section 1 of Article II and Section 6 of Article II. Moreover, the persons that acted as directors at the time did not approve nor ratify the contract; (v) the contract between NALIC and NAPRO did not have the authorization from the Office of the Insurance Commissioner; (vi) since May 2011 there was an Order to Safeguard the assets of NALIC, thus the December 2011 monthly fee payment required the authorization of the OCS because any disbursement under the same had to be approved by OCS; (vi) NALIC's obligation to pay the December fee was extinguished by Article 1138 of the Puerto Rico Civil Code, 31 L.P.R.A. §3193 that establishes that the debtor is released from the obligation when the benefit is legally or physically impossible; (viii) Multinational is not obliged to pay the December 2011 service fee because it has presented evidence that it had credits in excess of $115,000 to compensate or offset its alleged debt with NAPRO pursuant to Articles 1110 and 1149 of the Puerto Rico Civil Code which establishes compensation as a way to extinguish a debt (Docket No. 216, pgs. 23-25).

For the reasons discussed below, the court finds that the contract between NAPRO and Multinational was not validly terminated and thus, Multinational breached the same by not making the December 2011 fixed monthly payment. The court further finds that the evidence presented by the Defendant regarding its setoff defense pursuant to 11 U.S.C. §553 and Articles 1110 and 1149 of the PR Civil Code, 31 L.P.R.A. §§ 3151 & 3221 failed to evince that Multinational had a setoff claim. For the reasons stated herein, the court holds that Multinational owes NAPRO the monthly flat fee in the amount of $115,000.00 for the month of December 2011.

Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §§157(b)(1) and (b)(2). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

-3-

Relevant Procedural Background

The court will only include in this *Opinion and Order* the relevant procedural background regarding the controversies before the court at this juncture. For a detailed procedural background of this adversary proceeding refer to the April 6, 2020 *Opinion and Order* at Docket No. 175. Debtor filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on February 15, 2012 (Lead Case No. 12-01076). The deadline to file a proof of claim for all creditors was June 21, 2012 (Lead Case No. 12-01076, Docket No. 4).

The Debtor included in Schedule B- Personal Property, an account receivable from Multinational in the amount of $115,000 for administrative fees for the month of December 2011 (Lead case No. 12-01076, Docket No. 8, pg. 26). On March 14, 2013, the Debtor filed the instant adversary proceeding against Multinational for breach of contract and collection of monies owed pursuant to a service contract executed between the Plaintiff and Defendant National Life Insurance Company (NALIC), now Multinational Life Insurance Company (Docket No. 1). On May 9, 2013, the Defendant filed its *Answer to Complaint* and *Counterclaim* (Docket No. 10). On May 28, 2013, the Plaintiff filed its *Answer to Crossclaim*[1] (Docket No. 12).

Subsequently, on February 28, 2018, the evidentiary hearing was held. The court stated that regarding adversary proceeding 13-00051, it needed to know if the contract submitted is the contract and the other issue would be what happened in late November 2011 and early December 2011 to determine if there is any liability as to Defendant Multinational to pay the $115,000 (Docket No. 167). At the conclusion of the evidentiary hearing, the court stated, "… that at this point it was not going to hear evidence on the counterclaim. The court instructed the defendant to file its motion with the evidence as to the basis for the counterclaim and the Plaintiff/Debtor will

---

[1] The court notes that the Plaintiff titled its motion, *Answer to Crossclaim*. However, no crossclaim has been filed in this adversary proceeding. Only a counterclaim at docket no. 10.

-4-

have time to oppose. Irrespective of the evidence to be presented, the court is concerned as to what at this juncture may be collected from a debtor corporation that has a confirmed plan for actions arising during that period. The court stated that you have to go over the hurdle of the effects of a confirmed plan in making any claim against the debtor. Hearing evidence on that issue now without entertaining the legal issue will be a waste of time. The court ordered the defendant/counter claimant to move the court within thirty (30) days regarding the basis for the counterclaim and whether it can be collected at this time considering the juncture of the case. The Debtor has thirty (30) days to reply" (Docket No. 167, pgs. 18-19).

The following findings were made by the court regarding the instant adversary proceeding: (i) that the chapter 11 petition was filed on February 15, 2012; (ii) Multinational was not scheduled as a creditor; (iii) a review of the record shows that Multinational did not file a proof of claim; and (iv) that the plan filed on May 5, 2014 (Docket No. 379) was confirmed on May 23, 2014 (Docket No. 386) and Multinational was not included in the plan in Docket No. 379 (Docket No. 167).

On April 6, 2020, this Court in its *Opinion and Order* held the following: (i) the filing of a proof of claim is not a prerequisite to asserting the right of setoff; (ii) the Defendant in an adversary proceeding does not have to file a motion for relief of the automatic stay to assert its setoff rights as an affirmative defense or to file a counterclaim; (iii) setoff may be treated as an affirmative defense if no distribution from the bankruptcy estate is requested or it may be asserted as a permissive counterclaim if affirmative relief is sought; and (iv) in the instant case, 11 U.S.C. §553 takes precedence over 11 U.S.C. §1141. The court scheduled an evidentiary hearing for September 30, 2020 for the Defendant to present the documentary and witness evidence in support of its setoff defense, including the conclusion of the testimony of Pedro González (Docket No. 175). On July 24, 2020, the court ordered the parties to inform the court within fourteen (14) days whether the proposed findings of fact submitted on February 19, 2018 by both Plaintiff (Docket

No. 159) and Defendant (Docket No. 160) are what the parties will present to the court on September 30, 2020 (Docket No. 176). On August 10, 2020, NAPRO filed a *Motion Requesting Short Extension of Time to Comply with Order* and the same was granted on August 11, 2020 (Docket Nos. 178 & 179). On August 12, 2020, Multinational filed a *Motion Requesting Extension of Time to Comply with Order* (Docket No. 176) and the same was granted on August 14, 2020 (Docket Nos. 180 & 182).

On August 17, 2020, the Plaintiff filed a *Motion in Compliance with Order* by which it requested until September 14, 2020 to supplement its proposed findings of fact to include reference to the additional testimony and evidence which will be presented during the September 30, 2020 hearing as to the setoff defense and counterclaim (Docket No. 184). The same was granted on August 26, 2020 (Docket No. 185). On September 1, 2020, Multinational filed a *Motion to Extend Time to Comply with Court Order* requesting an extension of three days after Plaintiff files its Amended Proposed Findings of Fact to object and/ or further supplement our proposed findings of fact to include references to the additional testimony and evidence which will be presented during the hearing of September 30, 2020 (Docket No. 187). On September 3, 2020 the court granted Multinational's request (Docket No. 188). On September 4, 2020, the Plaintiff filed a *Motion Requesting that Filing of Updated Proposed Findings of Facts be Simultaneous* arguing that the court should reconsider its *Order* because allowing the Defendant three additional days would provide an unfair advantage (Docket No. 189). Also, on September 4, 2020, NAPRO filed an *Urgent Motion Requesting Order Directing Defendant to Comply with Order of the Court* requesting the Court to Order the Defendant to comply with the Order at Docket No. 167 to file its evidence as to the basis for the Counterclaim on or before September 11, 2020 (Docket No. 190). On September 8, 2020, the court granted NAPRO's motion (Docket NO. 189) ordering the parties to file simultaneous updated proposed findings of fact on September 17, 2020 (Docket No. 192).

Also, on September 8, 2020, the Court granted NAPRO's *Urgent Motion* (Docket No. 190) and ordered the Defendant to file its evidence as to the basis of its counterclaim on or before September 11, 2020 (Docket No. 193).

Thereafter, on September 11, 2020, the Defendant filed a *Motion in Compliance with Order and Extension of Time* requesting until September 15, 2020 to further supplement its list of evidence (Docket No. 196). On September 15, 2020, the Defendant filed a *Supplementary Motion Notifying Evidence to be Used at Hearing* (Docket No. 197). On September 16, 2020, NAPRO filed the *Plaintiff & Counter Defendant's Notice of Intent to Oppose Belated Evidence Not Previously Produced in Discovery* (Docket No. 198). On September 17, 2020, Multinational filed its *Amended Memorandum of Facts and Applicable [Law]* (Docket No. 199). On September 17, 2020, NAPRO filed its *Updated Proposed Findings of Fact* (Docket No. 200). On September 24, 2020, NAPRO filed an *Objection and Reaffirmation of Motion in Limine* regarding Mr. Carlos Iguina's testimony and requesting the court to exclude witnesses or evidence not identified or produced previously (Docket No. 202). On September 25, 2020, NAPRO filed a *Motion Requesting Authorization to Submit Evidence under Seal* and the same was granted on September 28, 2020 (Docket Nos. 203 & 205). On September 28, 2020, Multinational filed a *Motion in Compliance with Court Order Docket 201* (Docket No. 206).

On September 28, 2020, the Defendant filed a *Motion Filing Exhibits and Witness List as well as the Exhibit* (Docket No. 207). Also, on September 28, 2020, Multinational filed its *Opposition to Objection and Reaffirmation of Motion in Limine* (Docket No. 208). On September 28, 2020, the Plaintiff filed a *Sealed Motion Submitting Rebuttal Declarations* (Docket No. 209). Also, on September 28, 2020, NAPRO filed a *Sealed Motion Submitting Rebuttal Evidence* (Docket No. 210). On September 28, 2020, the Plaintiff filed a *Motion in Compliance with Order at Docket No. 201* submitting the list of evidence and copy of the evidence to be presented at the

September 30, 2020 hearing (Docket No. 211). On September 29, 2020, NAPRO filed a *Motion to Inform Regarding Declarations* (Docket No. 212). On September 29, 2020, the Plaintiff filed a *Sealed Motion Submitting Declarations and Evidence* to substitute those submitted at Dockets Nos. 209 and 210 (Docket No. 213). On September 30, 2020, the *Minutes* of the September 30, 2020 hearing were docketed (Docket No. 214). On October 30, 2020, the Defendant *filed its Post-Trial Memoranda and Proposed Findings of Fact and Law* (Docket No. 216). On October 30, 2020, the Plaintiff filed its *Post-Trial Brief* (Docket No. 217).

**<u>Findings of Fact</u>**

After considering the parties' proposed findings of fact, the evidence presented and the testimonies of the witnesses, the court finds that the following facts are not in controversy:

1. On January 4, 2011, NAPRO and NALIC, now Multinational, executed a Service Agreement (**JE I & JE II**).

2. Mr. Rafael Rios Miranda was the vice president of administration for NAPRO since the year 1986 until the year 2011 (**JE VI B; Testimony of Mr. Rafael Rios, Docket No. 167, pg. 6; Exhibit 4**).

3. Mr. Rafael Rios signed the service agreement between NAPRO and NALIC on behalf of NAPRO (**JE I, pg. 4; Testimony Mr. Rafael Rios Miranda, Docket No. 167, pg. 6: Exhibit 4**).

4. NAPRO and NALIC were part of a trade name known as National Group. Another member of National Group was National Insurance Company ("NIC"). National Group is a trade name that consists of the companies that were under the control of Carlos Benitez Rivera such as: National Insurance Company; National Life Insurance Company (NALIC); Insurance Adjusters and Appraisers; INSCO (technology business) and NAPRO amongst others. NAPRO provided

administrative services to the conglomerate of companies, including NALIC for many years (**Testimony of Mr. Pedro González Gorgas, Docket No. 214, pg. 3**).

5. The Service Agreement detailed the different services that were to be provided by the NAPRO to NALIC. The services included among others, advice to the Board of Directors, upon demand by NALIC, in the following fields: finance, accounting, reinsurance, insurance risk, etc. It also included human resources services and administrative work in general, including administration of real estate, coordination of reinsurances, printing services, messenger, mailing and purchase of materials (**JE I & II**).

6. The Service Agreement provided that the Debtor could consult other parties and was allowed to contract external services, if necessary (**JE I & II, Article 3**).

7. The Service Agreement provided in Article 5 for a fixed monthly flat fee for the services described in Article 1 in the amount of $115,000.00, equivalent to $1,380,000.00 annually (**JE I & II, Article 5**).

8. The Service Agreement original term began in the year 2007 and was renewed annually for years 2008 until the year 2011 under the same terms and conditions agreed to in the original contract. Testimony Rafael Rios Miranda (Docket No. 167, pg. 6: **Exhibit 4**).

9. The term of the Service Agreement was for one (1) year, commencing on January 1, 2011 and ending on December 31, 2011 (**JE I & II, Article 6**).

10. The court noted that the services contract does not include any specific clause regarding termination (**Docket No. 167, pg. 17: Exhibit 4**).

11. In the year 2011, NIC and NALIC had cross ownership among them, meaning that NIC was a shareholder of NALIC while at the same time NALIC was a shareholder of NIC (**JE VII**).

12. On May 17, 2011, the Office of the Insurance Commissioner issued an order to NALIC prohibiting sales, liquidation, transfers of assets, etc. to safeguard the assets of the company (**JE VIII**).

13. NAPRO was a shareholder of NALIC.

14. On October 11, 2011 and November 10, 2011, Aseguradora Ancon S.A., an insurance company authorized to do business in Puerto Rico, received approval from the Office of the Insurance Commissioner (OCS) to purchase NALIC's shares through a series of transactions (**JE IV, pg. 28**).

15. NALIC paid all the fees for services up to November 2011 (**Testimony of Mr. Rafael Ríos Miranda**, **Docket No. 167, pg. 6, Exhibit 4**; **RE 10**).

16. Attorney Iguina Oharriz testified that since the year 2013 he is the president of Multinational Life Insurance Company (**Testimony of Attorney Iguina**, **Docket No. 167, pgs. 9-10; Exhibit 4**).

17. Attorney Iguina testified that in August 2011, Mr. Tobias Carrero Nacar (who is the ultimate owner of the Grupo Multinacional de Seguros) hired Iguina's law firm to deal with the purchase of NIC which was being liquidated by the Office of the Insurance Commissioner (**Testimony of Attorney Iguina, Docket No. 167, pg. 10: Exhibit 4**).

18. Attorney Iguina testified that he was instructed by Mr. Tobias Carrero to review and investigate all the contracts that NALIC had with all their service providers to ensure that they were reasonable and sound for the company in order to change the financial and regulatory situation of that company (**Testimony of Attorney Iguina, Docket No. 167, pg. 10: Exhibit 4**).

19. On November 29, 2011, Carlos R. Iguina Oharriz sent a letter to Mr. Rafael Ríos Miranda, (vice president of administration of NAPRO) advising of NALIC's intent to terminate the Service Agreement and inviting to meet and discuss the actions to follow (**JE V**).

20. Mr. Rafael Rios testified that he received a letter from Mr. Iguina in November 2011 requesting a meeting to discuss the Service Agreement between NALIC and NAPRO. He further stated that pursuant to this letter, Mr. Iguina was requesting a meeting to discuss the contract. Mr. Rios testified that after receiving this letter he did not receive any other letter from Mr. Iguina terminating the contract and that he did not receive the monthly payment fee for December 2011 (**JE V; Testimony of Mr. Rafael Rios Miranda, Docket No. 167, pg. 6; Exhibit 4**).

21. Attorney Carlos R. Iguina Oharriz had no authorization to terminate the Service Agreement. He testified that he sent letters to terminate some contracts with the authorization of Mr. Tobias Carrero (**Testimony of Attorney Iguina, Docket No. 167, pg. 12, Exhibit 4**).

22. After November 30, 2011, Multinational did not request any services from NAPRO and no services were rendered by NAPRO for NALIC for the month of December 2011 (**Testimony of Attorney Iguina, Docket No. 167, pg. 13, Exhibit 4**).

23. On December 2, 2011, Mr. Carlos Benítez, President of NAPRO, sent a letter to Mr. Rafael Ríos informing him that NAPRO will cease its operations permanently as of today and all of its employees will be laid off effective December 2, 2011 at 5:00pm (**R-11**).

24. NALIC did not make the monthly payment of $115,000.00 for the month of December 2011 (**Testimony of Mr. Rafael Ríos; Docket No. 167, pg. 6; Exhibit 4**).

25. On December 14, 2011, NALIC changed its name to Multinational Life Insurance Company (**JE IV, pg. 9**).

26. Mr. Rafael Ríos testified that he did not send a collection letter to Multinational for the monthly payment of December 2011 and that he did not send a collection letter to Multinational during the entire year of 2012. Mr. Ríos testified that it was not until the 2013 complaint that NAPRO claimed that Multinational owed them $115,000.00 (**Testimony of Mr. Rafael Rios Miranda, Docket No. 167, pg. 8; Exhibit 4).**

27. The Debtor filed its petition under Chapter 11 of the Bankruptcy Code on February 15, 2012.

28. On March 14, 2013, the Plaintiff/Debtor filed the complaint for the collection of the $115,000.00 allegedly owed by Multinational pursuant to the Service Agreement.

29. On December 4, 2006, National Group Corp. entered into a Master Service Agreement with Evertec, Inc. for the rendering of services pertaining to data processing, check imaging, credit and debt transaction, among others (**JE 10**).

30. Pedro González Gorgas testified that he began working as director of internal audit for Multinational as of March 2012 to August 2015 and from September 2015 onward he has held the position of vice president of auto liability coverage (**Testimony of Pedro González Gorgas, Docket No. 167, pg. 18: Exhibit 4**).

31. Mr. González Gorgas testified that Multinational's management requested him to perform an audit for the period of February 2010 through summer 2012 because the check from Evertec regarding the reimbursement created reasonable doubt in the new management and they wanted to make sure that there was no more over invoicing (**Testimony of Pedro González Gorgas, Docket No. 214, pg. 3**).

32. Mr. González Gorgas testified that he audited the over invoicing related to NAPRO in June 2012 (**Testimony of Pedro González Gorgas, Docket No. 167, pg. 18: Exhibit 4.**)

33. Evertec's services under the Master Service Agreement covered services provided to the corporations that formed part of the National Group, including NALIC (**Testimony of Pedro González Gorgas, Docket No. 214, pg. 3**).

34. Evertec issued a check dated February 10, 2010 in the amount of $264,309.72 payable

to the order of National Group and the same was deposited in a NAPRO account on February 17, 2010 with FirstBank (**JE 11; Testimony of Pedro González Gorgas, Docket No. 214, pgs. 3-4**).

**<u>Issues before the court</u>**

The first issue before the court is whether there was a breach of the Service Agreement by Multinational for failure to pay the monthly fixed fee to NAPRO for the month of December 2011 or whether the same was validly terminated. Multinational contends that its obligation to pay the December 2011 fee was extinguished by Article 1138 of the Puerto Rico Civil Code, 31 L.P.R.A. §3193 that established that the debtor is released from the obligation when the benefit is legally or physically impossible. Multinational also finds support in Article 1077 of the PR Civil Code, 31 L.P.R.A. §3152 in which the faculty to resolve the obligations is implicit in reciprocal ones if one of the parties does not comply with what is incumbent upon him. Ancillary legal issues that have been argued by Multinational attacking the validity of the contract are the following: (i) the same was not previously approved by the Office of the Insurance Commissioner under Article 29.230 of the Insurance Code of Puerto Rico; (ii) the Service Agreement was not approved by a valid constituted Board of Directors of NALIC because at the time there was none and there was no corporate resolution from NALIC authorizing it to enter into the Agreement with NAPRO. This is in violation of NALIC's By-Laws; namely; Section 1 of Article II and Section 6 of Article II. The persons that acted as directors at the time did not approve or ratify the contract; and (iii) since May 2011 there was an Order to Safeguard the Assets of NALIC, thus the December 2011 monthly fee payment required the authorization of the OCS. If the court determines that the Service Agreement was a valid contract as of December 2011 and Multinational breached the same for failure to make the December 2011 payment, then the court will have to delve upon the second legal issue; namely

whether Multinational's setoff defense pursuant to Articles 1110 and 1149 of the Puerto Rico Civil Code is valid.

Applicable Law & Analysis

The Civil Code of Puerto Rico of 1930 ("PR Civil Code) was superseded on June 1, 2020 by Act No. 55 and the same pursuant to Article 1820[2] became effective one hundred and eighty days (180) after its enactment; that is on November 28, 2020. However, in the instant case the applicable PR Civil Code is the one prior to the amendment that is the Civil Code of 1930. Thus, the court's analysis will be based on the 1930 PR Civil Code. Article 9[3] of the PR Civil Code of 2020 provides that there is no retroactive effect except when it expressly states the contrary. The retroactive effect of a law may not prejudice the acquired rights under the prior law. Article 1812[4] of the PR Civil Code of 2020 provides that contracts executed under the prior legislation and that were valid pursuant to the same take effect under the prior law with the limitations established in this Code. The acts and contracts executed under the prior legislation that result ineffective under this legislation, do not acquire validity due to the fact that this Code provides something different in relation to its validity (effectiveness).

---

[2] Article 1820 of the amended PR Civil Code provides in the Spanish language: "Este Código comienza a regir a los ciento ochenta (180) días después de su aprobación."

[3] Article 9 of the amended PR Civil Code provides in the Spanish language: "La ley no tiene efecto retroactivo, excepto cuando se dispone expresamente lo contrario. El efecto retroactivo de una ley, no puede perjudicar los derechos adquiridos al amparo de una ley anterior."

[44] Article 1812 of the amended PR Civil Code provides in the Spanish language: "Los actos y contratos celebrados bajo el régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos sus efectos según la misma, con las limitaciones establecidas en este Código. Los actos y contratos celebrados bajo la legislación anterior y que resultan ineficaces bajo dicha legislación, no adquieren validez por el hecho de que este Código disponga algo distinto con relación a su eficacia."

-14-

*Analysis of contract pursuant to the Puerto Rico Civil Code of 1930*

The Service Agreement is devoid of a clause that explicitly determines the jurisdiction of the applicable law by which the contract shall be construed. However, both parties agree that the PR Civil Code of 1930 is the applicable law. Moreover, "[p]roperty and contract rights implicated in bankruptcy disputes are determined in accordance with state law." Butner v. United States, 440 U.S. 48, 59 L. Ed. 2d 136, 99 S. Ct. 914 (1979); Ralar Distrib., Inc. v. Rubbermaid, Inc. *(*In re Ralar Distrib., Inc*.*), 4 F.3d 62, 67-68 (1st Cir. 1993).

Article 1233 of the PR Civil Code provides, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." 31 L.P.R.A. §3471. In the instant case, the court notes that both parties agree that the terms of the contract are clear and there are no issues as to the intent of the parties.

Article 1206 of the PR Civil Code provides: "[a] contract exists from the moment one or more persons consent to bind himself or themselves, with regard to another or others, to give something or to render some service." 31 L.P.R.A. §3371. Article 1207 of the Puerto Rico Civil Code provides: "[t]he contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order." 31 L.P.R.A. §3372. Article 1210 of the Puerto Rico Civil Code provides: "[c]ontracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfilment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law." 31 L.P.R.A. §3375. Article 1213 provides: "[t]here is no contract unless the following requisites exist: (1) the consent of the contracting parties. (2) A definite object which may be the

-15-

subject of the contract. (3) The cause for the obligation which may be established." 31 L.P.R.A. §3391.

Article 1044 of the PR Civil Code provides: "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." 31 L.P.R.A. §2994. Article 1077 establishes, "[t]he right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him. The person prejudiced may choose between exacting the fulfilment of the obligation or its rescission, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfilment, should the latter appear impossible. The court shall order the rescission demanded, unless there are sufficient causes authorizing it to fix a period. This is understood without prejudice to the rights of third acquirers, in accordance with §§3496 and 3499 of this title, and with the provisions of the Mortgage Law and of the Property Registry, §§ 2001 et seq. of Title 30." 31 L.P.R.A. §3052

Article 1110 provides: "[o]bligations are extinguished by: [t]heir payment or fulfilment; by the loss of the thing due; by the remission of the debt; by the merging of the rights of the creditor and debtor; by compensation and by novation." 31 L.P.R.A. §3151. Article 1138 of the PR Civil establishes: "[i]n obligations to do, the debtor shall also be released when the prestation appears to be legally or physically impossible" 31 L.P.R.A. §3193.

Article 1138 is under Subchapter II which is titled, Loss of Thing Due. Article 1136 establishes, "[a]n obligation, consisting in the delivery of a specified thing, shall be extinguished when said thing should be lost or destroyed without fault of the debtor and before he should be in default." 31 L.P.R.A. §3191. Article 1137 provides, "[w]henever the thing should be lost, when in the possession of the debtor, it shall be presumed that the loss occurred by his fault and not by

a fortuitous event, unless there is proof to the contrary and without prejudice to the provisions of § 3013 of this title." 31 L.P.R.A. §3192.

Commentator Puig Brutau explains that the concept of impossibility of the prestation has a general meaning such as having lost the thing owed, and also that what had to be done became impossible to do. Of particular interest is the cause of the extinguishment of the obligation due to impossibility that affected a prestation that was possible when the obligation was constituted, but that later without fault of the debtor, the fulfillment (compliance) of that obligation becomes impossible in an absolute and definitive manner. [5] José Puig Brutau, Fundamentos de Derecho Civil, Tomo I, Vol. 2, 355 (Bosch, Casa Editorial, S.A. 1985). The concept of impossibility of the prestation has three (3) modalities namely: (i) the initial objective impossibility; (ii) the initial subjective impossibility; and (iii) the impossibility that arose subsequent to the initial obligation. José Puig Brutau, Fundamentos de Derecho Civil, Tomo I, Vol. 2, 357 (Bosch, Casa Editorial, S.A. 1985). In our case the pertinent modality is the impossibility that arose subsequent to the initial obligation. Commentator Puig Brutau further explains that there are differences depending on whether the obligation is to give or the obligation is to do. Article 1138 of the PR Civil Code pertains to an obligation to do. Commentator Puig Brutau analysis is the following: "A case pertaining to the extinguishment due to impossibility would be the death of the person obliged to do a particular type work because of his or her personal qualities in the same manner that the person obliged is unable to finish a particular type of work due to some (extraneous) cause

---

[5] Commentator Puig Brutau in the Spanish language: "Hemos visto que el concepto amplio de prestación se refiere a la conducta del sujeto obligado, tanto en las obligaciones de dar como en las de hacer o no hacer. Por ello, el concepto de imposibilidad de la prestación tiene un sentido general y se refiere, tanto al caso de haberse perdido la cosa debida, como al de haberse convertido en imposible lo que se tenia que hacer. Como causa de extinción de la obligación la imposibilidad que interesa es la sobrevenida, esto es, la que afecta a una prestación que era posible cuando la obligación quedó constituida, pero que después, sin culpa del deudor, resulta de imposible cumplimiento de una manera absoluta y definitiva." José Puig Brutau, Fundamentos de Derecho Civil, Tomo I, Vol. 2, 355 (Bosch, Casa Editorial, S.A. 1985).

(reason) independent of his will, in conformity with art. 1595[6] of the same Code with all of the effects that the same determines. Refer to art. 1161.[7]

In order for the debtor not to be found at fault (or in breach) pursuant to art. 1184[8] it is necessary that the obliged is not guilty (responsible) of the legal or physical impossibility that arose subsequent to the initial obligation. The general rule is that the debtor's obligation does not change due to the fact that the compliance becomes more onerous than what was anticipated at the time he or she became obliged" (translation ours)[9].   José Puig Brutau, Fundamentos de Derecho Civil, Tomo I, Vol. 2, 363-364 (Bosch, Casa Editorial, S.A. 1985).

Multinational contends that its obligation to pay the December 2011 fee was extinguished pursuant to Article 1138 of the Puerto Rico Civil Code, 31 L.P.R.A. §3193 which establishes that the debtor is released from the obligation when the benefit is legally or physically impossible. Multinational supports its assertion that the benefit was legally or physically impossible during the month of December 2011 because on December 2, 2011, Mr. Carlos Benítez, President of NAPRO, sent a letter to Mr. Rafael Ríos informing him that NAPRO would cease its operations

---

[6] The equivalent of article 1595 of the Civil Code of Spain is Article 1487 of the PR Civil Code, 31 L.P.R.A. §4128. Article 1487 provides: "[w]hen a certain work has been entrusted to a person by reason of his personal qualifications, the contract is rescinded by the death of said person. In such case, the owner must pay to the heirs of the constructor, in proportion to the price agreed upon, the value of the part of the work executed, and that of the prepared materials, provided he may obtain any benefit from such materials. The same shall be understood if the person who contracted for the work cannot finish it by reason independent of his will." 31 L.P.R.A. §4128.

[7] The equivalent of article 1161 of the Civil Code of Spain is Article 1115 of the PR Civil Code, 31 L.P.R.A. §3165. Article 1115 provides: "In obligations of doing, the creditor cannot be compelled to receive the prestation or the services from a third party, when the quality and circumstances of the person of the debtor should have been taken into account in establishing the obligation" 31 L.P.R.A. §3165.

[8] The equivalent of article 1184 of the Civil Code of Spain is Article 1138 of the PR Civil Code, 31 L.P.R.A. §3193.

[9] Commentator Puig Brutau in the Spanish language: "Como un caso de extinción por imposibilidad ha de considerarse el fallecimiento del obligado a quien se encargó cierta obra por razón de sus cualidades personales, y lo mismo se entenderá cuando el obligado no pueda terminar la obra por alguna causa independiente de su voluntad, como dispone el art. 1.595 del mismo Código, con los efectos que determina. Véase el art. 1.1161.
Por supuesto que para la liberación del deudor a que se refiere el art. 1.184, es necesario que el mismo obligado no sea culpable de la imposibilidad legal o física sobrevenida.
Por regla general la obligación del deudor no ha de alterarse por el hecho de que el cumplimiento le resulte más gravoso de lo que era presumable cuando quedó obligado. El derecho del acreedor no puede estar pendiente de que el deudor tenga mayores o menores dificultades para cumplir la prestación" José Puig Brutau, Fundamentos de Derecho Civil, Tomo I, Vol. 2, 363-364 (Bosch, Casa Editorial, S.A. 1985).

permanently and all of its employees will be laid off effective December 2, 2011. Multinational contends that NAPRO did not have the personnel nor was rendering services for the month of December 2011 for almost all items covered by the Service Agreement, such as Finance, Accounting, Products and Public Relations, Computer Related Matters and Reinsurance respectively. NAPRO was not providing the services it was obliged to perform under terms of the contract. However, Multinational through Mr. Iguina's testimony also contends that it did not request any services from NAPRO, and no services were rendered by NAPRO for NALIC for the month of December 2011.

NAPRO counters that after December 2, 2011, it could render the services through executive personnel of the National Group and it could also contract specialized personnel pursuant to Article 3 of the Service Agreement.

The court finds that Article 1138 is inapplicable in the instant case because the compliance of the obligations pertaining to the Service Agreement for the month of December 2011 never materialized into an impossibility simply because Multinational did not request any services to be rendered during that month. Therefore, NAPRO's obligation to render services never became legally or physically impossible and NAPRO did not have to resort to Article 3 of the Services Agreement. The court finds this argument hypothetical in nature and premature given that Multinational did not request services from NAPRO during the month of December 2011 and therefore NAPRO did not fail to render the services that were not requested in an absolute and definitive manner. Therefore, NALIC's obligation to pay the December fee was not extinguished by Article 1138 of the PR Civil Code.

Multinational further argues that the parties mutually agreed to terminate the contract as a result of the meeting of Attorney Iguina-O'harriz and Mr. Rafael Ríos Miranda. The letter dated November 29, 2011 was sent to Mr. Rafael Ríos Miranda, (vice president of administration of

NAPRO) informing NALIC's intent to terminate the contractual relation with NAPRO Services and stating that it was their intent for said termination to occur in an organized manner by which the parties would comply with their obligations. Mr. Iguina invited Mr. Ríos to communicate with him to meet and discuss the actions to follow. The letter was signed by Mr. Carlos Iguina Oharriz. (JE V[10]). Mr. Rafael Rios Miranda testified that after receiving the November 29, 2011 letter he did not meet with Mr. Iguina and attorney Iguina Oharriz testified that the meeting took place.

The court finds that the letter expresses the interest of ending a contractual relationship with NAPRO Services and that the same be carried out in an organized manner by which both parties can comply with their obligations. The court also finds that the letter does not state that the interest of NALIC, now Multinational, is to terminate the current Services Agreement for the month of December 2011 because NAPRO is unable to render the services under the agreement. Notwithstanding, attorney Carlos Iguina Oharriz testified that he had no authorization to terminate the Services Agreement and also testified that he sent letters to terminate some contracts with the authorization of Mr. Tobias Carrero.

The court concludes that the November 29, 2011 letter and the alleged subsequent meeting between Mr. Rafael Ríos Miranda and attorney Iguina Oharriz did not constitute a valid termination of the Services Agreement in controversy.

The next issue is whether the Office of the Insurance Commissioner had to approve the Services Agreement pursuant to Article 29.230 of the Insurance Code of Puerto Rico, 26 L.P.R.A.

---

[10] The letter states the following in the Spanish language: Estimado Sr. Ríos:
"Es el interés de NALIC de finalizer la relación contractual con NAPRO Services. También es nuestro deseo que dicha terminación se efectúe de una manera organizada en la cual las partes cumplamos con nuestras obligaciones. Agradeceré que se comunique con el suscribiente para pautar una reunión durante esta semana en la que podamos dialogar sobre los pasos a seguir.
Esperando por usted, me despido" (Docket No. 217-6, JE V).

§2923 ("PR Insurance Code). Article 29.230 of the PR Insurance Code, titled, Prohibited interest of officers and directors in certain transactions, provides:

"(1) No director or officer of an insurer shall accept, except for the insurer, or be the beneficiary of any fee, brokerage, gift, or other emolument because of any investment, loan, deposit, purchase, sale, exchange, reinsurance, or other similar transaction made by or for the insurer, or be pecuniarily interested therein in any capacity except on behalf of the insurer.

(2) This section does not prohibit such a director or officer from becoming a policyholder of the insurer and enjoying thereunder all the rights and privileges usually and customarily provided therein for holders of such policies in general. This section shall not apply with respect to bona fide insurance agency contracts to which any such director or officer is a party on his own account or on account of parties other than the insurer." 26 L.P.R.A. §2923.

The court finds that Article 29.230 of the PR Insurance Code is inapplicable to the instant controversy. The next article, namely Article 29.240, titled, Management and exclusive agency contracts, provides:

"(1) No cooperative or mutual cooperative stock insurer shall make any contract whereby any person is granted or is to enjoy in fact the management of the insurer or the controlling or preemptive right to produce substantially all insurance business for the insurer, unless such contract is filed with the Commissioner and be subject to his disapproval. The contract shall be deemed effective unless disapproved by the Commissioner within thirty days after date of filing, subject to such reasonable extension of time as the Commissioner may require by notice given within such thirty days. Each disapproval shall be delivered to the insurer in writing, stating the grounds therefor.

(2) The Commissioner shall disapprove any such contract if he finds that it:
(a) subjects the insurer to excessive charges; or
(b) is to extend for any unreasonable length of time; or
(c) does not contain fair and adequate standards of performance, or
(d) contains other inequitable provisions or provisions which jeopardize the proper interests of stockholders, partners, or members of the insurer." 26 L.P.R.A. §2924.

Article 29.240 of the PR Insurance Code specifically refers to a contract in which a person is granted the management of the insurer or the controlling right to produce substantially all of the insurance business for the insurer is generally not permitted unless this particular contract is filed with the Commissioner and the same is deemed effective unless disapproved by the

Commissioner within a thirty (30) days after having been filed. Article 1.6[11] of the Services Agreement, titled, Administration and Human Resources, provides for NAPRO to assist NALIC in managing its personnel system, organizational structure, development of the work environment, payroll and attendance pursuant to the instructions that it receives from NALIC's President and to make recommendations to the Board of Directors and the President of NALIC regarding matters related to the general administration of NALIC. The court finds that the Services Agreement does not grant the management of the insurer the controlling right to produce substantially all of its business. Moreover, if NALIC, now Multinational, deemed that such contract provided these rights to NAPRO then it was NALIC's duty to file the same with the Office of the Commissioner and seek its approval.

Notwithstanding, the court notes that in the Report on Examination of Multinational Life Insurance Company as Amended as of December 31, 2010, the Office of the Insurance Commissioner found that the corporation was in violation of section 29.230(1) as it was clear that directors and officers of the company had entered into an administrative agreement with Option Healthcare Network , which represented a conflict of interest. In addition, the company was found to be in violation of Section 29.240 of the Insurance Code of Puerto Rico because the agreement was not filed with the OCS for approval (JE IV, pgs. 11-12). The Report on Examination as of December 31, 2010 classified the Services Agreement with NAPRO as an intercompany

---

[11] Article 1.6, titled, Administration and Human Resources, provides:
"Make recommendations to the Board of Directors and the President of the Corporation about the human resources policy to be followed by the Corporation, the classification, recruitment, compensation, promotion, transfer, removal, training and retention of personnel in general of the Corporation.
Pursuant to the instructions that it receives from the President of the Corporation, assist the Corporation in managing its personnel system, organizational structure, development of the work environment, payroll and attendance.
Make recommendations to the Board of Directors and the President of the Corporation about matters related to the general administration of the Corporation and implement any matters related to this subject matter that the Board of Directors of the Corporation may entrust to the Services Company. Perform the administrative work described in Attachment A of this document, which is made a part hereof." (JE II, pgs. 1-2).

agreement to provide certain services and the fees pursuant to the contract were based on a monthly flat fee in the amount of $115,000.00 (JE, pgs. 14-15).

The court finds that Multinational failed to adequately argue this particular legal issue given that it did not explain how Article 29.230 or Article 29.240 of the PR Insurance Code was applicable to the Services Agreement in controversy. The court concludes that this argument, as presented, is devoid of legal justification.

The next issue the court will delve into is whether the Service Agreement was invalid (void *ab initio*) because it was not approved by a valid constituted Board of Directors of NALIC and in violation of NALIC's by-laws and there was no corporate resolution from NALIC authorizing it to enter into the Agreement with NAPRO.

Section 1 of Article II of NALIC's by-laws provide:

"(1) Powers: [t]he business and property of the Corporation shall be conducted and managed by a Board of ten (10) Directors, which may exercise all of the powers of the Corporation, except such as are by statute, by the charter, or by the By-Laws conferred upon or reserved to the stockholders. The number of Directors may be increased by resolution of the Board of Directors, provided, however, that the number of directors shall not in any case exceed twelve (12), and vacancies occurring by reason of an increase in the number of directors may be filled in the manner hereinafter provided. The Board of Directors shall elect a chairman who shall preside at all Meetings of the Stockholders and the Board of Directors at which he shall be present. The Board of Directors shall elect a Vice Chairman who at the request of the Chairman or during his absence or inability shall exercise the powers of the Chairman and when so acting shall have the powers of the Chairman" (JE IX, pgs. 3-4).

Section 6 of Article II of the by-laws provides:

"Quorum: [a]t all meetings of the Board of Directors, a majority of the directors shall constitute a quorum for the transaction of business. Except in cases in which it is by Statute, by the Charter of the By-Laws otherwise provided, the vote of a majority of such quorum at a duly constituted meeting shall be sufficient to elect and pass any measure. In the absence of a quorum, the directors, present, by a majority vote and without notice other than by announcement, may adjourn the meeting from time to time until a quorum shall attend. At any such adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting as originally notified" (JE IX, pg. 8).

-23-

The court notes that the Report on Examination of Multinational Life Insurance Company, amended as of December 31, 2010, which was dated June 27, 2012, disclosed that during the period under examination there were only five directors that comprised the Board of Directors and, thus, the corporation was not in compliance with Article II, Section 1 of its by-laws which requires ten directors. Footnote 3 of this Report on Examination states, "[t]he Company has indicated that since this exam it has implemented such a procedure to comply with its by-laws. After the exam, the Board of Directors is comprised of ten (10) directors which is in compliance with the Company's by-laws" (JE IV, pgs. 6, 11). The Report on Examination disclosed various intercompany agreements, including the Services Agreement NALIC had with NAPRO. It also disclosed as a subsequent event that the contract was cancelled in November 2011 following the sale of the Company (JE IV, pg. 17).

NALIC was represented in the execution of the Service Agreement by its senior vice-president and NAPRO was represented in this act by its vice-president. Neither had a corporate resolution approving their representation on behalf of said corporations. No corporate resolution was referenced in the intercompany Services Agreement.

Article III, Section 2, titled, President, of NALIC's by-laws provide:

"[t]he President shall have, subject to the control of the Board of Directors, the general administration and supervision of the business of the Corporation; he may sign and execute, in the name of the Corporation, all authorized deeds, mortgages, bonds, contracts or other instruments, except in cases in which the signing and execution thereof shall have been expressly delegated to some other officer, or agent of the Corporation; and he shall perform such other duties as, from time to time, may be assigned to him by the Board of Directors" (JE IX, pgs. 9-10).

Article III, Section 3, titled, Vice-President, of NALIC's by-laws provides:

"[t]he Vice President or Vice Presidents, at the request of the President or in his absence or during his inability to act, shall perform the duties and exercise the functions of the President and, when so acting, shall have the powers of the President. If there be more than one Vice President, the Board of Directors may determine which one or more of the Vice President shall perform any of such duties or exercise any of such functions, or, if

-24-

such determinations is not made by the Board of Directors, the President may make such determination. Otherwise, any of the Vice President, may perform any of such duties or exercise any of such functions. The Vice President shall have such other duties (JE IX, pgs. 10-11).

Article 4.02(a) of the General Corporations Act of Puerto Rico, 14 L.P.R.A. §3562 provides:

"(a) Every corporation organized in accordance with this subtitle shall have officers with such titles and duties as are provided in the by-laws of the corporation or in a resolution of the board of directors which is not inconsistent with such bylaws, and as may be necessary to allow the corporation to execute instruments and stock certificates in compliance with subsection (a)(2) of § 3503 of this title and § 3591 of this title. One of the officers shall be appointed president, chief executive officer or other analogous title. One of the officers shall record all of the minutes of all meetings of the stockholders of the corporation and of the board of directors in a book to be kept for said purposes. An officer may simultaneously hold one (1) or more of the offices established, unless the certificate of incorporation or the bylaws provide otherwise. To secure the performance of his/her duties, the board of directors may require any officer to post a bond, in the amount and with such surety or sureties as the board may provide." 14 L.P.R.A. §3562.

According to commentator Díaz Olivo, "[t]he obligations, titles and the faculties that these possess are specified in the corporate statutes or in the resolutions of the Board of Directors" (translation ours[12]). C. Díaz Olivo, Corporaciones: Tratado sobre Derecho Corporativo, Columbia, 2016, pg. 193. Professor Díaz Olivo further explains that, "[b]esides the authority explicitly given (authorized/bestowed) in the statutes or issued by the board through corporate resolutions, the officers possess very little authority that is inherent to his/her position.[13]" Id. at 193-194 (translation ours).  Díaz Olivo sustains that, "[i]n the case of the president, the authority to act on behalf (in the name) of the corporation cannot be assumed and that the president does not possess inherent powers to purchase or dispose of properties for the corporation because he

[12] Commentator Díaz Olivo in the Spanish language: "[l]as obligaciones, los títulos y las facultades que estos posean se especifican en los estatutos de la corporación o en las resoluciones de la junta de directores." C. Díaz Olivo, Corporaciones: Tratado sobre Derecho Corporativo, 2016, pg. 193.

[13] Commentator Díaz Olivo in the Spanish language: "[a]parte de la autoridad concedida expresamente en los estatutos o por las resoluciones de la junta, los oficiales poseen muy poca autoridad inherente a su posición" Id. at 193-194.

is not the representative (power of attorney) of the corporation. It has also been resolved that even in the cases in which the president has authority to execute contracts in the ordinary course of business, such authority is limited, and does not allow the president to bind the corporation in transactions that are unusual or extraordinary[14]" Id. at 193-194 (translation ours).

Professor Díaz Olivo sustains that the determination of whether an officer or an agent of the corporation has the capacity to bind and act in the name of the corporation does not depend on his/her title, but on the authority that was conferred or that was apparently conferred.[15]" Id. at 195 (translation ours). Díaz Olivo explains that real authority is defined as the one that the principal makes the agent realize (understand) that he/she possess. Id. at 195. Real authority may be express or implicit. Id. The express real authority is the one that is conferred in the statutes or the resolutions of the Board of Directors. The implicit real authority is the one that is inferred through the words and the conduct of the corporation and the agent or officer framed in the context of the relationship between them. Id. The figure of apparent authority has also been recognized and it has the particularity that said figure is only recognized by third parties. Id. at pgs. 195-196 (translation ours)[16].

---

[14] Díaz Olivo in the Spanish language: "Se ha indicado que en el caso del presidente, la autoridad para actuar a nombre de la corporación no puede presumirse y que este no posee poder inherente para comprar o disponer de propiedades para la corporación. Esto es así porque el president no es de por sí un mandatario de la corporación. También se ha resuelto, respecto al presidente, que aun cuando su cargo le confiera autoridad para efectuar contratos en el curso ordinario de los negocios, tal autoridad es limitada, y no por esto puede vincular a la corporación en transacciones poco usuales o extraordinarias" Id. at 193-194.

[15] Commentator Díaz Olivo in the Spanish language: "Asimismo, Díaz Olivo sostiene que la determinación de si un oficial o agente de la corporación posee la capacidad para vincular y actuar a nombre de la misma no depende de su título, sino que depende de la autoridad que le fue conferida o que aparentemente se le confirió" Id. at 195.

[16] Professor Díaz Olivo in the Spanish language: "Para determinar si en efecto la persona posee la autoridad para representar o vincular a la corporación se han desarrollado varias figuras. La primera de ellas es la de la autoridad real. La autoridad real se define como la que el principal da a entender al agente que posee. Id. at 195. A su vez, la autoridad real puede ser expresa o implícita. Id. La autoridad real expresa es la que se confiere en los estatutos o en las resoluciones de la junta de los directores. Id. Por otro lado, la autoridad real implícita es aquella que se infiere de las palabras y de la conducta de la corporación y del agente o funcionario enmarcado en el contexto de la relación entre estos. Id. También se ha reconocido la figura de la autoridad aparente, la cual tiene la particularidad de que solo es reconocida frente a terceras personas." Id. at 195-196.

Pursuant to NALIC's by-laws which are considered express real authority, the Vice-President at the request of the President or in his absence or during his inability to act, shall perform the duties and exercise the functions of the President and, when so acting, shall have the powers of the President which include signing and executing contracts in the name of the Corporation. The court finds that Multinational's allegations lack factual and legal foundation as it failed to present evidence and legal arguments that supported its position. Thus, based on the analysis herein, the court finds that pursuant to NALIC's by-laws the vice-president had the express real authority to execute contracts in the name of the corporation. NALIC also failed to establish the reason(s) or particular by-laws that established that an intercompany service agreement had to be approved by the Board of Directors.

Lastly, Multinational argues that the Services Agreement did not have the authorization from the Office of the Insurance Commissioner and that since May 2011 there was an Order to Safeguard the assets of NALIC, thus the December 2011 monthly fee payment required the authorization of the OCS because any disbursement had to be approved by the OCS. On May 17, 2011, the Office of the Insurance Commissioner issued an order to NALIC prohibiting the sale, liquidation, transfers of assets, exchanges, or the disposal of its assets in any other manner, without the prior authorization of the Office of the Insurance Commissioner (**JE VIII**).

The court notes that the notes to NALIC's amended financial statements for the year ended December 31, 2010 disclose the following regarding the Order to Safeguard Assets, "On May 17, 2011 OCS issued the Company an order to safeguard assets ("NALIC Order") as a cautionary measure to protect the Company's assets. The NALIC Order did not impose business or product restrictions but required the company to obtain pre-approvals from the OCS for the sale, liquidation, transfer, exchange or any type of disposition of assets" (R-14, 2.V., pg. 19.7). The

notes to the financial statements also disclosed that, " [o]n November 14, 2011 the OCS removed the order to safeguard assets imposed to the Company in May 2011" (R-14, 2.VI, pg. 19.7).

The court finds that the Order is to safeguard NALIC's assets and therefore prohibits NALIC from disposing of its assets pursuant to certain business transactions with legal implications, but there is no prohibition regarding NALIC's day-to-day payment of its monthly operating expenses such as the service contract it had with NAPRO in which it paid $115,000 monthly. Consequently, the court concludes that disbursements regarding monthly operating expenses, such as the monthly service fee of $115,000.00 did not require prior authorization from the OCS.

For the reasons explained herein, the court determines that the Service Agreement was a valid contract as of December 2011 and that Multinational breached the same for failure to make the December 2011 fixed fee payment.

The second legal issue before the court is whether Multinational's setoff defense pursuant to 11 U.S.C. §553 and Articles 1110 and 1149 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 3151 & 3221 is valid.

*The right of setoff pursuant to 11 U.S.C. §553*

The right of setoff is a right of equitable origin that "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A" Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18, 116 S. Ct. 286, 289, 133 L. Ed. 2d 258, 262 (1995) (quoting Studley v. Boylston Nat. Bank, 229 U.S. 523, 528, 57 L. Ed. 1313, 33 S. Ct. 806 (1913)). Even though the right of setoff is equitable in origin, the Bankruptcy Code provides no general equitable mechanism for disallowing setoff rights that are preserved by section 553. "Consistent with the text of section 553, the best statement of modern law and practice is that, if the relevant claim and debt constitute mutual obligations within the meaning of section 553, a right of setoff should be recognized in bankruptcy unless the right is

invalid in the first instance under applicable nonbankruptcy law, or unless it is otherwise proscribed by some express provision of the Code. There remains no general equitable power to disallow a valid right of setoff preserved under section 553." Richard Levin & Henry J. Sommer, 5 Collier on Bankruptcy ¶553.02[3] (16th ed. 2020).

"In general, Section 553[17](a) recognizes and preserves a right of setoff where four conditions exist: (1) the creditor holds a 'claim' against the debtor that arose before the commencement of the case; (2) the creditor owes a 'debt' to the debtor that also arose before the commencement of the case; (3) the claim and debt are 'mutual'; and (4) the claim and debt are each valid and enforceable." Richard Levin & Henry J. Sommer, 5 Collier on Bankruptcy ¶553.01[1] (16th ed. 2020). It is important to note that section 553 does not create setoff rights, it preserves those that already exist under applicable law and the requirements of section 553 must be satisfied. Id at ¶553.01[2].  The party asserting setoff has the burden of proof. See Pester Refining Co. v. Mapco Gas Products, Inc. (In re Pester Refining Co.), 845 F. 2d 1476, 1486 (8th Cir. 1988).

---

[17] 11 U.S.C. §553(a) provides:

"(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

    (1)  the claim of such creditor against the debtor is disallowed;
    (2)  such claim was transferred, by an entity other than the debtor, to such creditor—
        (A)  after the commencement of the case; or
        (B)  (i) after 90 days before the date of the filing of the petition; and
            (ii) while the debtor was insolvent (except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561 or
    (3)  The debt owed to the debtor by such creditor was incurred by such creditor—
        (A)  After 90 days before the date of the filing of the petition;
        (B)  while the debtor was insolvent; and
        (C)  for the purpose of obtaining a right of setoff against the debtor (except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561." 11 U.S.C. §553(a).

-29-

Article 1110 of the PR Civil Code provides: "[o]bligations are extinguished by: [t]heir payment or fulfilment; by the loss of the thing due; by the remission of the debt; by the merging of the rights of the creditor and debtor; by compensation and by novation." 31 L.P.R.A. §3151.

Article 1149 of the PR Civil Code provides: "[c]ompensation shall take place when two (2) persons, in their own right, are mutually creditors and debtors of each other." 31 L.P.R.A. §3221.

Article 1150 of the PR Civil Code provides: In order that compensation may be proper, it is required:

(1) That each of the persons bound should be so principally, and that he be at the same time the principal creditor of the other.
(2) That both debts consist of a sum of money or, when the things due are perishable, that they be of the same kind and also of the same quality, if the latter should have been stipulated.
(3) That both debts are due.
(4) That they be determined and demandable.
(5) That none of them is subject to any retention or suit instituted by a third person, and of which due notice has been given the debtor." 31 L.P.R.A. §3222.

It is important to note that there are three kinds of compensation: legal, judicial and voluntary. The legal compensation is the one governed by the Civil Code, and it is produced when there is compliance with all the requirements of articles 1149 and 1150 of the PR Civil Code. Furthermore, there is a requirement that there be no legal prohibition to compensation. Walla Corporation v. Banco Comercial de Mayaguez, 114 D.P.R. 216, 1983 PR Sup. Lexis 103 (P.R. 1983).

Multinational's setoff claim is based on a check dated February 10, 2010 issued by Evertec and payable to National Group in the amount of $264,309.72 which was deposited in a NAPRO bank account (JE XI). Multinational alleges that Evertec issued the check due to over invoicing to the National Group and that NAPRO had to allocate amongst the different corporations that comprised the National Group the total amount of the check, and that NALIC's allocation of the

Evertec reimbursement was in the amount of $58,361.83. However, no evidence was admitted by the court as to the NALIC's alleged allocation of the check ($58,361.83) and that said allocation was accounted as an intercompany receivable by NALIC and an account payable by NAPRO. Thus, Multinational did not satisfy its burden of proof.

Multinational also alleges a setoff claim in the amount of $70,000.00 based on NAPRO's answer to paragraph 13 of Multinational's counter-claim and its answer to interrogatory question nine (9) (Docket No. 216, pgs. 18-19).

Multinational in its counter-claim alleged the following:

"[u]pon information and belief, as part of the relationship the parties had between them, NAPRO was loaned and/or owed money to NA[L]IC and/or Multinational Life Insurance Company totaling an amount not less than $75,000.00. At this time, NAPRO has, without justification, failed to repay those monies to Multinational Life Insurance Company. Said debt was never condoned by Multinational Life Insurance Company and, thus, the same remains outstanding up to this date" (Docket No. 10, pg. 7).

NAPRO's answer to paragraph 13 of the counter-claim was as follows:

"Paragraph 13 of the crossclaim is denied as alleged. It is alleged that due to the special relationship between the companies that formed the National Group, of which both National Insurance Company and NAPRO were part of, there is a debt, but the amount is not as alleged" (Docket No. 12, pg. 3).

Interrogatory question nine (9) was the following:

"With specific reference to your denial of paragraph 13 of the counterclaim, please explain the special relationship that you alleged existed between the companies that formed National Group, how the debt originated, when the debt originated, who supervised or overlooked this accounting exception, allowance or payment, what amount you alleged is supposedly owed" (JE XII, pg. 9)

NAPRO's answer to question nine (9) was as follows:

"Companies that formed National Group were mostly founded by the same person, Carlos Benitez Jimenez, as they were needed to provide services for one another. NAPRO does not know when or how the specific debt of $70,000.00 originated, but it is older than 3 years, and originated before Ancon acquired NALIC's shares owned by National Insurance Company and the rest of NALIC's shares, and changed its name to Multinational Life Insurance Company. The debt was never claimed by NALIC or

Multinational Life Insurance Company before NAPRO filed its bankruptcy" (JE XIII, pg. 6).

Interrogatory question ten (10) posed by Multinational was as follows:

"With specific reference to your denial of paragraph 13 of the counterclaim, please explain who requested the loan and/or accounting allowance which is now referred to as the "debt" of paragraph 13, who approved the loan, what were the agreements reached for the payment of said "debt," and state if there were ever any notes, endorsements and/or documents drafted with regards to this debt" (JE XII, pg. 9).

NAPRO's answer to question ten (10) was the following:

"NAPRO has no recollection of when or how the debt arose. There are no documents to explain the origin of the debt" (JE XIII, pg. 6).

NALIC's financial statements for the year ended December 31, 2010, disclose in line item #23 receivables from parent, various subsidiaries and various affiliates in the amount of $2,377,667 (JE III). NALIC's amended financial statements for the year ended December 31, 2010 disclose in line item #23 receivables from parent, various subsidiaries and various affiliates in the amount of $9,643 (R-14, pg. 2). The court did not find an explanation for this marked decrease in the notes to the financial statements nor was it provided by Multinational. However, the court notes that certain assets that are designated as "non-admitted" are excluded from the statutory statement of admitted assets, liabilities, capital and surplus by a charge to surplus. The notes to the financial statements disclose other receivables as a non-admitted asset in the amount of $3,432,672 (R-14, pg. 19.1). Line item #23 receivables from parent, various subsidiaries and various affiliates is a non-admitted asset. Consequently, Multinational did not prove to the court that its alleged setoff claims remained unpaid and constituted part of NALIC's receivables as reported in the financial statements.

Based on the analysis discussed herein, the court concludes that Multinational did not satisfy its burden of proof regarding its setoff defense. Therefore, the court concludes that Multinational did not prove that it held a pre-petition claim against the debtor.

Conclusion

In view of the foregoing, this court holds that the contract between NAPRO and Multinational was not validly terminated. The court also finds that Multinational's obligation to pay the December fee was not extinguished by Article 1138 of the PR Civil Code, 31 L.P.R.A. §3193. Therefore, Multinational breached the Service Agreement by not making the December 2011 fixed monthly payment. The court concludes that the evidence presented by the Defendant as to its setoff defense pursuant to 11 U.S.C. §553 and Articles 1110 and 1149 of the PR Civil Code, 31 L.P.R.A. §§ 3151 & 3221 failed to evince that Multinational had a setoff claim. Consequently, Multinational owes NAPRO the monthly flat fee in the amount of $115,000.00 for the month of December 2011.

Judgment will be entered accordingly.


SO ORDERED.

In San Juan, Puerto Rico, this 12th day of March, 2021.


Enrique S. Lamoutte
United States Bankruptcy Judge

-33-