**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE FIRST CIRCUIT

---

**BAP NO. PR 21-016**

---

**Bankruptcy Case No. 12-01076-ESL**
**Adversary Proceeding No. 13-00051-ESL**

---

**NATIONAL PROMOTERS AND SERVICES, INC.,**
Debtor.

---

**NATIONAL PROMOTERS AND SERVICES, INC.,**
**Plaintiff-Appellee,**

v.

**MULTINATIONAL LIFE INSURANCE COMPANY,**
**Defendant-Appellant.**

---

**Appeal from the United States Bankruptcy Court**
**for the District of Puerto Rico**
**(Hon. Enrique S. Lamoutte, U.S. Bankruptcy Judge)**

---

**Before**
**Cary, Fagone, and Katz,**
**United States Bankruptcy Appellate Panel Judges.**

---

**Marcos Valls-Sanchez, Esq., on brief for Defendant-Appellant.**
**Carmen D. Conde Torres, Esq., Luisa S. Valle Castro, Esq., and**
**William J. Alemañy-Méndez, Esq., on brief for Plaintiff-Appellee.**

---

**July 28, 2022**

---

**Fagone, U.S. Bankruptcy Appellate Panel Judge.**

Following a trial, the bankruptcy court determined that Multinational Life Insurance Company had breached its contract with the chapter 11 debtor and was liable for the resulting damages. The court also determined that Multinational failed to prove the existence of a debt owed by the debtor and therefore could not offset that alleged debt against liability for breach of contract. Dissatisfied with these rulings, Multinational asked the court to reconsider. The bankruptcy court declined that request, and this appeal followed.

Multinational has not shown the type of error that would mandate reversal. For that reason, we affirm both challenged orders.

<u>**BACKGROUND**</u>

**I. The Parties**

This appeal arises out of an adversary proceeding brought by the chapter 11 debtor, National Promoters and Services, Inc. (the "Debtor") against Multinational. The Debtor and Multinational were part of a conglomerate of insurance companies operating under the trade name "National Group." At one point, Multinational was known as National Life Insurance Company or "NALIC," but later changed its corporate name. Because the name change is not material to our analysis, we refer only to Multinational.

**A. The Service Contract**

On January 4, 2011, the Debtor and Multinational executed a service agreement (the "Service Contract") for the Debtor to provide certain services to Multinational, including making recommendations in the areas of finance, accounting, public relations, computer related matters, risk reinsurance, and human resources. The Service Contract required the Debtor to "implement any matters related to [these areas] that the Board of Directors of [Multinational] may entrust to

the [Debtor]." Further, the Service Contract obligated the Debtor to provide a range of administrative services which were described on an attachment to the contract. Article 3 of the Service Contract authorized the Debtor "to consult specialized personnel of [Multinational] and to hire any specialized personnel necessary to render the services contracted." Article 4 provided that the Debtor "must render the services contracted [t]hereunder, subject to the directives and restrictions imparted by [Multinational's] Board of Directors from time to time."

The Service Contract required Multinational to pay a fixed monthly fee of $115,000 to the Debtor for a period of one year, commencing on January 1, 2011. The Service Contract did not have provisions allowing either party to terminate the contract prior to its expiration on December 31, 2011.

### B.    Other Relevant Events

At some point in 2011, the shares of Multinational changed hands and the new shareholder decided to evaluate Multinational's contracts, including the Service Contract. To that end, Attorney Carlos Iguina Oharriz sent a letter dated November 29, 2011, to Rafael Ríos Miranda, the Debtor's vice president of administration. In that letter, Attorney Iguina wrote:

> [Multinational] would like to put an end to its contractual relationship with [the Debtor]. We would also like this termination to be carried out in an organized manner where, we, the parties will fulfill our obligations.
>
> I would appreciate it if you would contact the undersigned to arrange a meeting this week in order to discuss the steps to be followed.
>
> I will be waiting for your response.

Three days later, the Debtor's president, Carlos Benítez Rivera, sent a letter to Mr. Ríos informing him that the Debtor would cease its operations permanently as of December 2, 2011, and its employees would be terminated. Thereafter, Multinational did not request any services

from the Debtor, and the Debtor rendered no services to Multinational. Multinational did not make any payment to the Debtor for December 2011.

## II. The Bankruptcy Proceedings

### A. The Adversary Proceeding

The Debtor filed its chapter 11 petition in February 2012. A little more than a year later, the Debtor commenced an adversary proceeding alleging breach of contract by Multinational. In response, Multinational asserted numerous affirmative defenses, including that: (1) the "party that breached the contract was [the Debtor]"; (2) Multinational owed nothing to the Debtor "as the contract was terminated before the accumulation of said debt"; and (3) under the "compensation doctrine" in the Puerto Rico Civil Code, P.R. Laws Ann. tit 31, § 3221 (akin to setoff), Multinational owed nothing to the Debtor.[1]

Multinational also asserted a counterclaim, alleging breach of the Service Contract by the Debtor for failure to provide the required services. Further, in paragraph 13 of the counterclaim, Multinational alleged:

> Upon information and belief, as part of the relationship the parties had between them, [the Debtor] was loaned and/or owed money to NA[L]IC and/or Multinational Life Insurance Company totaling an amount of no less than $75,000.00. At this time, [the Debtor] has, without justification, failed to repay those monies to Multinational Life Insurance Company. Said debt was never condoned by Multinational Life Insurance Company and thus, the same remains outstanding up to this date.

In response to paragraph 13, the Debtor stated: "Paragraph 13 is denied as alleged. It is alleged that due to the special relationship between the companies that formed the National Group, of which both National Insurance Company and [the Debtor] were part of, there is a debt, but the amount is not as alleged."

---

[1] Section 3221 and other statutes discussed below from the Puerto Rico Civil Code were superseded effective November 28, 2020. There is no dispute, however, that the now superseded statutes apply to this matter.

4

During the discovery phase of the adversary proceeding, Multinational served the Debtor

with a set of interrogatories, which included two questions regarding the alleged debt owed by

the Debtor. Interrogatory No. 9 queried:

> With specific reference to your denial of paragraph 13 of the Counterclaim, please
> explain the special relationship that you alleged existed between the companies
> that formed National Group, how the debt originated, when the debt originated,
> who supervised or overlooked this accounting exception, allowance or payment,
> what amount you alleged is supposedly owed.

The Debtor responded to Interrogatory No. 9 as follows:

> Companies that formed National Group were mostly founded by the same person,
> Carlos M. Benítez Jiménez, as they were needed to provide services for one
> another. [The Debtor] does not know when or how the specific debt of
> $70,000.00 originated, but it is older than 3 years . . . . The debt was never
> claimed by [Multinational] before [the Debtor] filed for Bankruptcy.

Although the counterclaim alleged a debt of "no less than $75,000," the parties' attention became

focused on the "specific debt of $70,000" seemingly acknowledged by the Debtor in its answer

to this interrogatory.

> In Interrogatory No. 10, Multinational asked:

> With specific reference to your denial of paragraph 13 of the Counterclaim, please
> explain who requested the loan and/or accounting allowance which is now
> referred to as the "debt" of paragraph 13, who approved the loan, what were the
> agreements reached for the payment of said "debt," and state if there were ever
> any notes, endorsements and/or documents drafted with regards to this debt . . . .

The Debtor responded that it had "no recollection of how or when the debt [arose]. There are no

documents to explain the origin of the debt."

**B.     The Trial**

The bankruptcy court conducted a two-day trial beginning on February 28, 2018, and

concluding on September 30, 2020. The court heard testimony from four witnesses—Mr. Ríos,

Attorney Iguina, Pedro González Borgas (Multinational's auditor at the relevant time), and Mr.

Benítez—and numerous exhibits were admitted in evidence. However, the Debtor's answers to

interrogatories—which were essential to Multinational's setoff claim as they purportedly established the existence of a $70,000 debt owed by the Debtor—were *not* expressly admitted in evidence. Instead, the bankruptcy court, over Multinational's objection and after extensive discussion, initially *excluded* the interrogatory answers from evidence and does not appear to have revised that ruling later in the trial.

### 1. Testimony of Rafael Ríos

Mr. Ríos testified that he was the Debtor's vice president of administration until 2011 and that he signed the Service Contract on the Debtor's behalf. The Debtor had provided services to Multinational since 2007, and the service agreement between the parties was renewed annually on essentially the same terms (other than price and term). Mr. Ríos testified that while he received the November 29, 2011 letter, he did not meet with Attorney Iguina after receiving it, nor did he receive any other letter from Attorney Iguina terminating the Service Contract. As to the Debtor's ability to perform under the Service Contract in December 2011, Mr. Ríos stated that although only a few employees remained, he and Mr. Benítez had sufficient experience and expertise to perform the duties required under the Service Contract. Mr. Ríos further explained that if the Debtor did not have employees to provide certain services required under the Service Contract, it was authorized by the Service Contract to hire outside personnel to provide those services. The Debtor, therefore, was able to perform under the Service Contract in December 2011.

### 2. Testimony of Attorney Iguina

Attorney Iguina confirmed that he sent the November 29, 2011 letter to Mr. Ríos requesting a meeting. When questioned about his authority to terminate the Service Contract, Attorney Iguina testified as follows:

Q.  Now, sir, before going to the contents of the letter . . . what authorization did you have to terminate the contract?

A.  *None at all.*

Q.  Who had that authorization?

A.  The owner of the group.  I was an attorney back then.

(emphasis added).

He further stated that after sending the November 29, 2011 letter, he met with Mr. Ríos the next day to discuss the Service Contract.  He conceded, however, that he never told Mr. Ríos the Service Contract was terminated:

Q.  . . . It was your statement that . . . when you sent that letter [the November 29, 2011 letter], you had no authorization to terminate the contract, correct?

A.  That's correct.
    . . . .

Q.  . . . After this letter of November 29th, 2011, which you stated, I do not have authority to terminate the contract, . . . did you send another letter terminating the contract?

A.  No.

Q.  And . . . you met with Mr. Rios the next day?

A.  Yes. . . .
    . . . .

Q.  . . . *[T]he fact is that you did not tell Mr. Rios this contract is terminated?*

A.  *That's correct.*

(emphasis added).

### 3.    Testimony of Pedro González Gorgas

Multinational also presented the testimony of Mr. Pedro González Gorgas, its auditor, in support of its setoff claim.  Mr. González, however, testified exclusively about monies the Debtor allegedly owed to Multinational from a "reimbursement" check received from

7

Evertec, Inc., which provided payroll services to all the companies within National Group. He did not testify about the $70,000 the Debtor allegedly owed Multinational.

### 4. Carlos Benítez Rebuttal Testimony

On rebuttal, the Debtor offered two sworn declarations of Mr. Benítez—one to rebut Attorney Iguina's testimony and the other to rebut the testimony of Mr. González regarding the setoff claim. It also offered additional evidence, including Multinational's amended financial statements for 2009 and 2010. Of particular significance here, Mr. Benítez stated that Mr. Ríos never agreed to terminate the Service Contract, and it was unilaterally terminated by Attorney Iguina, who lacked authority to terminate the contract. He also emphasized that Multinational's financial statements for 2009 and 2010 did not reflect that the Debtor owed anything to Multinational.

### C. The Opinion and Order

Following the trial, the bankruptcy court ruled that: (1) the Service Contract was not validly terminated and, therefore, Multinational's obligation to make the $115,000 payment was not extinguished; (2) Multinational's failure to make the fixed monthly payment of $115,000 for December 2011 constituted a breach of the Service Contract; and (3) Multinational had not demonstrated a right of setoff.

### 1. No Unilateral Termination Due to Debtor's Breach

The bankruptcy court first considered, and rejected, Multinational's argument that its obligation to pay the fee for December 2011 was extinguished based upon the Debtor's alleged inability to perform its obligation. Multinational argued it was "legally or physically impossible," see P.R. Laws Ann. tit. 31, § 3193, for the Debtor to perform services under the Service Contract during the month of December 2011. The bankruptcy court disagreed, however, finding that the Debtor was only required to perform services "upon demand," and

8

Multinational did not demand or request any services from the Debtor during December 2011.

The court reasoned:

> [T]he compliance of the obligations pertaining to the [Service Contract] for the month of December 2011 never materialized into an impossibility simply because Multinational did not request any services to be rendered during that month. Therefore, [the Debtor's] obligation to render services never became legally or physically impossible and [the Debtor] did not have to resort to Article 3 of the [Service Contract]. The court finds this argument hypothetical in nature and premature given that *Multinational did not request services from [the Debtor] during the month of December 2011 and therefore [the Debtor] did not fail to render the services* that were not requested in an absolute and definitive manner. Therefore, [Multinational's] obligation to pay the December fee was not extinguished by Article 1138 of the Civil Code [P.R. Laws Ann. tit. 31, § 3193].

(emphasis added).

### 2.    No Mutual Agreement to Terminate

Finding that Attorney Iguina "had no authorization to terminate the [Service Contract]," the bankruptcy court also determined that there was no mutual agreement to terminate the Service Contract:

> The court finds that the letter expresses the interest of ending a contractual relationship with [the Debtor] and that the same be carried out in an organized manner by which both parties can comply with their obligations. The court also finds that the letter does not state that the interest of . . . Multinational, is to terminate the current [Service Contract] for the month of December 2011 because [the Debtor] is unable to render the services under the agreement. Notwithstanding, attorney Carlos Iguina Oharriz testified that he had no authorization to terminate the [Service Contract] and also testified that he sent letters to terminate some contracts with the authorization of Mr. Tobias Carrero.
>
> *The court concludes that the November 29, 2011 letter and the alleged subsequent meeting between Mr. Rafael Ríos Miranda and attorney Iguina Oharriz did not constitute a valid termination of the [Service Contract] in controversy.*

(emphasis added).

### 3.    No Right to Setoff

Finally, the bankruptcy court considered whether Multinational had demonstrated a valid setoff claim under Puerto Rico law for the $70,000 debt that the Debtor allegedly owed

9

to Multinational.  Acknowledging that Multinational's setoff claim rested entirely on the

Debtor's answers to paragraph 13 of Multinational's counterclaim and Interrogatory Nos. 9 and

10, the bankruptcy court first recited those answers, and then turned to Multinational's financial

statements for 2010 and concluded as follows:

> [Multinational's] financial statements for the year ended December 31, 2010,
> disclose in line item #23 receivables from parent, various subsidiaries and various
> affiliates in the amount of $2,377,667 . . . .  [Multinational's] amended financial
> statements for the year ended December 31, 2010 disclose in line item #23
> receivables from parent, various subsidiaries and various affiliates in the amount
> of $9,643 . . . .  The court did not find an explanation for this marked decrease in
> the notes to the financial statements nor was it provided by Multinational.
> However, the court notes that certain assets that are designated as "non-admitted"
> are excluded from the statutory statement of admitted assets, liabilities, capital
> and surplus by a charge to surplus.  The notes to the financial statements disclose
> other receivables as a non-admitted asset in the amount of $3,432,672 . . . .  Line
> item #23 receivables from parent, various subsidiaries and various affiliates is a
> non-admitted asset.  *Consequently, Multinational did not prove to the court that
> its alleged setoff claims remained unpaid and constituted part of
> [Multinational's] receivables as reported in the financial statements.*
>
> Based on the analysis discussed herein, the court concludes that Multinational did
> not satisfy its burden of proof regarding its setoff defense.  *Therefore, the court
> concludes that Multinational did not prove that it held a pre-petition claim
> against the debtor.*

(emphasis added).

### 4.    Conclusion

Based on the foregoing, the bankruptcy court ruled:

> [T]he contract between [the Debtor] and Multinational was not validly terminated.
> The court also finds that Multinational's obligation to pay the December fee was
> not extinguished by Article 1138 of the PR Civil Code, 31 L.P.R.A. § 3193.
> Therefore, Multinational breached the Service [Contract] by not making the
> December 2011 fixed monthly payment.  The court concludes that the evidence
> presented by the Defendant as to its setoff defense pursuant to 11 U.S.C. § 553 and
> Articles 1110 and 1149 of the PR Civil Code, 31 L.P.R.A. §§ 3151 & 3221 failed
> to evince that Multinational had a setoff claim.  Consequently, Multinational owes
> [the Debtor] the monthly flat fee in the amount of $115,000.00 for the month of
> December 2011.

### D.    Order Denying Motion to Reconsider

Multinational filed a motion for reconsideration under Federal Rule of Bankruptcy

Procedure 9023.  The bankruptcy court denied the motion, ruling that "the facts and legal

arguments presented in the motion for reconsideration" did not "support a reversal."

### E.    The Appeal

This appeal followed.  On appeal, Multinational essentially reiterates most of the

arguments it presented below.[2]  It also assigns error to the bankruptcy court's failure to find

whether a meeting took place between Attorney Iguina and Mr. Ríos, and its determination that

Multinational had not demonstrated a right to setoff, insisting that the Debtor admitted the

existence of a $70,000 debt owed to Multinational.  The Debtor counters that Multinational

proffered no admissible evidence to support its claim that a $70,000 debt existed and that the

evidence that was admitted showed there were no intercompany debts owed.

**APPELLATE JURISDICTION**

We have jurisdiction to hear appeals from final orders and judgments of the bankruptcy

court.  28 U.S.C. § 158(a)-(c).  In an adversary proceeding, a judgment that adjudicates all the

claims or rights and liabilities of all the parties is final and appealable.  See Fed. R. Civ. P.

54(a)-(b); Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643,

646-47 (B.A.P. 1st Cir. 1998) (citing Estancias La Ponderosa Dev. Corp. v. Harrington (In re

Harrington), 992 F.2d 3, 5 & 6 n.3 (1st Cir. 1993)); see also Fed. R. Bankr. P. 7054(a)

---

[2]  Although the bankruptcy court also considered, and rejected, Multinational's challenges to the validity
of the Service Contract and its assertion of a setoff claim based on the Evertec "reimbursement" check,
Multinational does not challenge those rulings in this appeal.

(making Fed. R. Civ. P. 54(a)-(c) applicable in adversary proceedings). Here, the bankruptcy court has entered such a judgment. Therefore, we have jurisdiction to review that judgment.[3]

## STANDARD OF REVIEW

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. See U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC, 138 S. Ct. 960, 965-66 (2018) (acknowledging typical appellate review standards for trial court decisions); Fed. R. Civ. P. 52(a)(6); Fed. R. Bankr. P. 7052 (making Fed. R. Civ. P. 52 applicable in adversary proceedings). "A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); see also Anderson v. City of Bessemer City, 470 U.S. 564, 573-75 (1985) (discussing bases for rule requiring such deference to original fact finder). De novo review of a legal conclusion means that the appellate court does not "give any deference to the [lower] court's conclusion and look[s] at the legal issues with clear eyes." Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir. 2019) (citation omitted).

## DISCUSSION

I.    **The Bankruptcy Court Did Not Err in Ruling that Multinational Breached the Service Contract**

To determine whether Multinational breached the Service Contract, we look to the applicable state law. See 28 U.S.C. § 1652; 48 U.S.C. § 734; cf. Butner v. United States,

---

[3] Although Multinational listed the order denying reconsideration in its notice of appeal, it did not address that order in either its statement of the issues on appeal or its opening brief. Only after the Debtor highlighted this omission did Multinational, for the first time in its reply brief, state in cursory fashion that the court abused its discretion in denying reconsideration. Arguments raised for the first time in a reply brief are "ordinarily deemed waived," see United States v. Casey, 825 F.3d 1, 12 (1st Cir. 2016) (citation omitted), and this argument was not sufficiently developed to warrant our consideration of it.

440 U.S. 48, 54-55 (1979).  Although the Service Contract does not contain a choice of law provision, the parties agree that Puerto Rico law applies.  We turn, therefore, to Puerto Rico contract law, which "is governed by civil law principles," including those expressed in the Puerto Rico Civil Code.  See Arthur Young & Co. v. Vega, 136 P.R. Dec. 157, 169 (1994) (noting the "obligation to safeguard the civil law principles and traditions inherent to our cultural and historic reality" and cautioning against indiscriminately or thoughtlessly "adopting common law doctrines and rules of interpretation").

### A.    Basic Principles of Puerto Rico Contract Law

The Puerto Rico Civil Code provides that contracts are "binding, regardless of the form in which they were executed, 'provided the essential conditions required for their validity exist.'" Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 31 (1st Cir. 2012) (quoting P.R. Laws Ann. tit. 31, § 3451).  Further, "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations."  P.R. Laws Ann. tit. 31, § 2994.  Here, Multinational does not challenge the bankruptcy court's rulings as to the validity of the Service Contract and the resulting damages of $115,000.  Because of this, we focus only on whether Multinational breached the Service Contract.  See Yacht Caribe Corp. v. Carver Yacht LLC, 270 F. Supp. 3d 547, 555 (D.P.R. 2017) (listing elements of cause of action for breach of contract under Puerto Rico law as including valid contract, a party's breach, and resulting damages).

### B.    Breach of the Service Contract

Under Puerto Rico law, a party's failure to fulfill a contractual obligation generally constitutes a breach of the contract.  See, e.g., Constructora Bauzá, Inc. v. García López, 129 P.R. Dec. 579, 593-94 (1991).  Accordingly, to determine whether the bankruptcy court

erred in ruling that Multinational breached the Service Contract, we must first determine whether Multinational failed to comply with any of its obligations under the contract.

The Service Contract unquestionably provided for Multinational to make fixed monthly payments of $115,000 to the Debtor. Multinational, however, did not make the payment to the Debtor for December 2011. The record, therefore, supports a conclusion that Multinational breached the contract unless, as Multinational claims, its obligation to remit the December 2011 payment was extinguished by the termination of the contract. We consider, therefore, whether the Service Contract was validly terminated, either by mutual agreement of the parties or unilaterally by Multinational.

### 1. No Mutual Agreement to Terminate Service Contract

Without citing applicable authority, Multinational argues that "there is no controversy that the parties to a contract can terminate their relation by mutually agreeing to it" and "that the [Service Contract] was legally terminated by mutual agreement" during a meeting held on November 30, 2011, between Mr. Ríos and Attorney Iguina. Multinational contends that the bankruptcy court, faced with contradictory testimony of Mr. Ríos and Attorney Iguina as to whether that meeting occurred, should have determined whether the meeting actually took place, stating instead that "the November 29, 2011 letter and the alleged subsequent meeting . . . did not constitute a valid termination" of the Service Contract.[4]

Assuming that a contract could be terminated by mutual agreement under Puerto Rico law, Multinational's argument falters for two reasons. First, Multinational ignores Attorney

---

[4] Multinational urges us to resolve this factual dispute by making findings as to whether the meeting occurred and what transpired at that meeting. While we can review the bankruptcy court's findings for clear error, see Fed. R. Civ. P. 52(a)(6), an appellate court "should not simply [make] factual findings on its own." Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 713-14 (1986) (discussing options available to appellate court in reviewing and addressing trial court's factual findings or lack thereof); see also Fed. R. Civ. P. 52(b) (providing procedure for party seeking amended and additional factual findings from trial court); Fed. R. Bankr. P. 7052 (shortening timeframe for party's action under Fed. R. Civ. P. 52(b)).

Iguina's clear admission at trial that he *never told* Mr. Ríos that the Service Contract was terminated.  Second, Multinational also disregards the bankruptcy court's finding, based on Attorney Iguina's unrebutted testimony, that he had no authority to terminate the Service Contract.  Multinational does not acknowledge, let alone challenge, this finding on appeal.  Based on the record before us, even if the alleged meeting between Attorney Iguina and Mr. Ríos took place, as Multinational insists, Attorney Iguina lacked authority to bind Multinational to an agreement with the Debtor to terminate the Service Contract.  Consequently, the bankruptcy court correctly determined there was no valid termination of the Service Contract based on mutual agreement.

### 2. No Valid Unilateral Termination by Multinational

"[W]hen one of the parties to [an] agreement does not comply with [its] obligation, the [Puerto Rico] Civil Code grants the aggrieved party the right to choose between fulfillment of the obligation or rescission of the same, and to seek damages and interest in both cases." Ramírez Anglada v. Club Cala de Palmas, 23 P.R. Offic. Trans. 311 (1989) (citing P.R. Laws Ann. tit. 31, § 3052).[5]  As a "general principle," the aggrieved party cannot choose to seek fulfillment of the obligation unless it has met its own obligations.  See, e.g., Mora Dev. Corp. v. Sandín, 18 P.R. Offic. Trans. 847, 857 & n.7 (1987).  If the aggrieved party has not done so, the

---

[5]  This statute provides, in relevant part:

> The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him.

> The person prejudiced may choose between exacting the fulfilment of the obligation or its rescission . . . .

P.R. Laws Ann. tit. 31, § 3052; see also Dopp v. HTP Corp., 947 F.2d 506, 510 n.4 (1st Cir. 1991) (observing that although "rescission" and "rescind" appear in § 3052's English translation, "these terms, technically, are not synonymous with the terms 'resolucion' and 'resolver' which appear in the original Spanish text").

other party may raise that failure as a defense, thereby excusing that party's failure to perform its

own obligations. Id. (noting that general principle is inferred from the Puerto Rico Civil Code,

including P.R. Laws Ann. tit. 31, §§ 3017 & 3052). The remedy of "rescission" (or

"resolucion," as provided in the law's original Spanish text)—which, for policy reasons, may be

chosen only when an essential or principal obligation has gone unfulfilled—can allow the

aggrieved party to consider the contract to have been terminated upon the other party's

nonperformance, excusing any further performance by the aggrieved party. Ramírez Anglada,

23 P.R. Offic. Trans. 311; Dopp, 947 F.2d at 510-11 & n.4 (discussing remedy of resolution

under P.R. Laws Ann. tit. 31, § 3052); see also Flores v. Municipality de Caguas, 14 P.R. Offic.

Trans. 674, 683 (1983) (describing P.R. Laws Ann. tit. 31, § 3052 as "contemplat[ing] the so-

called tacit resolutory condition which permits unilateral dissolution of a contract when the other

party has breached its obligation"). Applying these legal principles, if the Debtor breached the

Service Contract by failing to perform an essential or principal obligation *first*, then

Multinational would have been entitled to terminate the contract and avoid making the payment

for December 2011. The Debtor's failure—and inability—to provide services in December

2011, Multinational insists, constituted such a breach of the Service Contract.

There is no dispute that the Debtor did not provide any services to Multinational in

December 2011. It is also undisputed, however, that Multinational did not *request or demand*

any services from the Debtor during that timeframe. The bankruptcy court interpreted the

Service Contract as requiring the Debtor to provide services "upon demand by [Multinational]."

In other words, the bankruptcy court concluded that the Debtor was only obligated to render

services to Multinational under the Service Contract if services were expressly requested by

Multinational. The record contained no evidence of any specific request from Multinational to

the Debtor for services in December 2011. It follows, therefore, that because Multinational

16

never requested services from the Debtor in December 2011, the Debtor was not obligated to render any such services and its failure to do so did not constitute a breach of contract.[6]

Nor has Multinational demonstrated the Debtor breached the Service Contract because it could not perform services in December 2011 due to its lack of personnel. The unrebutted evidence reflected that while most of the Debtor's employees were terminated on December 4, 2011, the Debtor was still able to render the contracted services either through its executive personnel or by contracting with specialized personnel as authorized by the Service Contract. Multinational, therefore, failed to establish the Debtor was incapable of fulfilling its obligations under the Service Contract.

In sum, we discern no error in the bankruptcy court's determination that Multinational's obligation to pay the December 2011 fee was not extinguished by a valid unilateral termination of the Service Contract by Multinational.

## II. The Bankruptcy Court's Rejection of Multinational's $70,000 Setoff-Based Counterclaim Was Not Reversible Error

### A. Setoff Rights in Bankruptcy

Setoff rights "allow[] entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." Citizens Bank of Md. v. Strumpf, 516 U.S. 16, 18 (1995) (citation and internal quotation marks omitted). "Although no federal right of setoff is created by the Bankruptcy Code, . . . § 553(a)

---

[6] The bankruptcy court did not identify the specific provision(s) of the Service Contract or applicable law supporting its "on demand" determination. The Service Contract could be interpreted as requiring some services upon demand by Multinational and others as a matter of course (whether demanded or not). In fact, this is an interpretation seemingly urged by the Debtor before and at trial. That said, Multinational did not identify the bankruptcy court's determination on this score in its statement of issues on appeal, and only challenged the determination for the first time on appeal in its reply brief. As noted above, arguments or issues raised in a reply brief for the first time on appeal are ordinarily deemed waived. While we may have discretion to depart from that general rule, see Sparkle Hill v. Interstate Mat Corp., 788 F.3d 25, 29-30 (1st Cir. 2015), we see no reason to do so here. This is particularly true when the bankruptcy court's "on demand" determination was central to its ultimate conclusions.

17

provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in

bankruptcy." Id. at 18. For § 553(a) to apply, the party claiming a setoff must first establish

that, before the bankruptcy, a valid setoff right arose under substantive nonbankruptcy law. See

Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc. (In re Pub. Serv. Co. of N.H.), 884 F.2d 11, 14

(1st Cir. 1989) (discussing setoff generally). The issue here is whether Multinational established

a right of setoff under Puerto Rico law.[7]

### B.      Right of Setoff Under Puerto Rico Law

Under Puerto Rico's Civil Code, the concept of "legal compensation" recognizes an

extinguishment of mutual debts between two parties up to the concurrent amount of the debts,

when certain criteria have been met. P.R. Laws Ann. tit. 31, §§ 3221, 3222, 3228; Ramos

Acosta v. Caparra Dairy, Inc., 16 P.R. Offic. Trans. 78, 84-87 (1985); Walla Corp. v. Banco

Comercial de Mayagüez, 14 P.R. Offic. Trans. 279, 285-87 (1983). For our purposes here,

compensation under the civil law is analogous to setoff under the common law. See generally

William H. Loyd, The Development of Set-Off, 64 U. Pa. L. Rev. 541 (1916), available at

https://scholarship.law.upenn.edu/penn_law_review/vol64/iss6/1.

Under the Puerto Rico Civil Code, legal "[c]ompensation . . . take[s] place when two (2)

persons, in their own right, are mutually creditors and debtors of each other." P.R. Laws Ann.

tit. 31, § 3221; Walla Corp., 14 P.R. Offic. Trans. at 285-86. More specifically, legal

compensation requires:

---

[7] As stated previously, Multinational raised the Puerto Rico setoff-related doctrine of "compensation" as
an affirmative defense to the Debtor's breach of contract claim. It also asserted a counterclaim alleging,
among other things, breach of contract due to the Debtor's failure to repay a pre-petition loan of at least
$75,000. After supplemental briefing by the parties in the adversary proceeding, the bankruptcy court
ruled that confirmation of the Debtor's chapter 11 plan did not bar Multinational from raising
"compensation" or setoff as an affirmative defense. The parties do not challenge this ruling on appeal.
Because the bankruptcy court and the parties analyzed Multinational's claim as a right to setoff, we do the
same.

(1) That each of the persons bound should be so principally, and that he be at the same time the principal creditor of the other.

(2) That both debts consist of a sum of money or, when the things due are perishable, that they be of the same kind and also of the same quality, if the latter should have been stipulated.

(3) That both debts are due.

(4) That they be determined and demandable.

(5) That none of them is subject to any retention or suit instituted by a third person, and of which due notice has been given the debtor.

P.R. Laws Ann. tit. 31, § 3222; see also Ramos Acosta, 16 P.R. Offic. Trans. at 85-86; Walla Corp., 14 P.R. Offic. Trans. at 285-87 (stating that for legal compensation to apply, the debts must be "liquid, demandable, and due" among other factors required under P.R. Laws Ann. tit. 31, §§ 3221, 3222, 3228).

### C.    Applying the Setoff Principles

Multinational argues that it met its burden of establishing that the Debtor owes a $70,000 debt and that it is entitled to set off that debt against the $115,000 it now owes the Debtor. Pointing to the Debtor's answers to its counterclaim and interrogatories, Multinational insists the Debtor "admitted the existence of the claim in favor of Multinational."  Having established the existence of a $70,000 debt through the Debtor's admissions, Multinational contends, the burden shifted to the Debtor "to provide affirmative proof that it extinguished such obligation," which it failed to do.  The bankruptcy court, Multinational claims, erred by failing to consider the Debtor's admissions when making its ruling on the setoff defense.

We find, however, no reversible error by the bankruptcy court.  Based on the record before us, although the bankruptcy court generally acknowledges them in its decision, we are hard pressed to conclude that the Debtor's answers to interrogatories were admitted in evidence. In fact, the bankruptcy court seemed to have *excluded* them from evidence on the first day of

trial, and while other joint exhibits including Multinational's interrogatories were proffered and admitted on the second day of trial, the interrogatory *answers* were not.[8]  While we are not convinced that the bankruptcy court's exclusion of the interrogatory answers was appropriate, we need not address the issue, as we ultimately conclude that any error by the bankruptcy court was harmless.  See Tersigni v. Wyeth, 817 F.3d 364, 369 (1st Cir. 2016) (stating appellate court "may affirm in spite of an erroneous evidentiary ruling if the error was harmless, meaning that 'it is highly probable that the error did not affect the outcome of the case'") (quoting McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006)).  Even if we were to rule that the bankruptcy court's exclusion of the interrogatory answers was erroneous, we simply cannot conclude that Multinational satisfied its burden of proving the existence of a pre-petition debt owed by the Debtor to Multinational.

First, we do not agree that the Debtor's answers to the counterclaim and interrogatories contain an unequivocal admission by the Debtor that it owed a debt to Multinational.  In fact, a careful reading of the Debtor's responses reveals that while the Debtor may have acknowledged the existence of some debt owed by some member of National Group at some point in time, it did not admit that the Debtor owed a debt directly to Multinational as of the bankruptcy filing.  And Multinational proffered no testimony or other documentary evidence to support its allegation as to the existence and amount of the debt allegedly owed by the Debtor or to show that the debt was demandable from the Debtor on the petition date.  Second, the only other evidence that *was* admitted—Multinational's financial statements for 2009 and 2010—did not

---

[8]  At the conclusion of the second day of trial, it seems that the parties proffered, and the bankruptcy court admitted, certain joint exhibits (identified by exhibit numbers) in evidence.  However, Joint Exhibit 13— the Debtor's answers to interrogatories—was not specifically identified during the colloquy on joint exhibits (or otherwise as far as we can tell).

show any such debt to be due and owing directly from the Debtor to Multinational.[9]  In the

absence of any other evidence to support Multinational's setoff claim, this omission in the

financial statements undercuts, to a degree, the Debtor's alleged admission as to the existence of

the debt.

In light of the foregoing, we are not persuaded that the bankruptcy court committed

reversible error in ruling that Multinational failed to meet its burden of proving its setoff defense

under the Puerto Rico compensation statute.  See P.R. Laws Ann. tit. 31, § 3222.  Having failed

to demonstrate a right to setoff under Puerto Rico law, Multinational was not entitled to assert a

setoff right in a proceeding related to the Debtor's chapter 11 case.

**CONCLUSION**

For the reasons discussed above, we **AFFIRM** the judgment and the order denying

reconsideration.

---

[9]  Although Multinational argues that the bankruptcy court erred by admitting the financial statements as "rebuttal evidence"—insisting the Debtor should have presented that evidence in its case-in-chief—we discern no error in that ruling.  There is no reason why a plaintiff should be required to present evidence that is only relevant to a counterclaim (here, Multinational's financial statements) when the plaintiff is attempting to make a prima facie case on its own pleading (here, the Debtor's complaint).  In any event, as Federal Rule of Evidence 611(a) has been interpreted, courts have discretion in determining whether to compel parties to deviate from the typical order of evidence presentation or to adhere to it, as was done here.  See 28 Victor J. Gold, Federal Practice and Procedure § 6164 (2d ed.) (describing "traditional sequence of presentation" of evidence and collecting cases on courts' discretion to deviate).